**MAYFLOWER VEHICLE SYSTEM, INC., Petitioner–Appellant,**

v.

**Elaine L. CHAO, Secretary of Labor, Respondent–Appellee.**

No. 01–4166.

United States Court of Appeals, Sixth Circuit.

July 7, 2003.

Before BATCHELDER and ROGERS, Circuit Judges, and BARZILAY, Judge.*

* The Honorable Judith M. Barzilay, Judge, United States Court of International Trade   sitting by designation.

## OPINION

BARZILAY, Judge.

Appellant Mayflower Vehicle Systems, Inc. ("Mayflower") appeals from a final Order of the Occupational Safety and Health Review Commission (the "Commission") finding a serious violation of 29 C.F.R. § 1910.217(c)(3)(vii)(d)(1998) on or before June 23, 1999, for failure to secure the two-hand control for an OBI 200 press so that "only a supervisor or safety engineer is capable of relocating the controls."

## BACKGROUND

Mayflower operates a plant in Shadyside. Ohio, engaged in manufacturing truck parts and other related products. Located at the plant is an OBI 200 mechanical power press, the use of which varies from "day to day" to "every other month." The press is operated by a "palm button station" (also called a stand), which is a device that requires simultaneous use of both hands to operate the machine. The station can be affixed, by use of an "extendable arm" to various places including the frame of the press, a table near the press, the bolster plate (which holds dies used in the press) or other objects. Mayflower's "rule of thumb" was to have the station mounted at least 36 inches away from the press' point of operation.

On June 20, 1999, an employee of Mayflower, P.J. Asturi, was involved in an accident, resulting in a partial amputation of his left hand. Mayflower claims that after the accident, Mr. Asturi tested positive for cocaine use. In response to that accident a representative from the Occupational Safety and Health Administration ("OSHA") investigated the plant. As a result of that investigation Mayflower was

cited for three violations by the Secretary of Labor ("Secretary"). Two of those violations were later withdrawn. On June 14 and 15, 2000, a trial was held before Administrative Law Judge Michael H. Schoenfeld. The ALJ found that Mayflower had "violated the cited standard's requirements." However, the ALJ rejected the Secretary's alleged classification of the violation as "serious" and re-characterized the violation as *de minimis* based on the facts of the case. The ALJ found that the violation was *de minimis* because the violation had "no direct or immediate relationship to safety or health" because the violation "standing alone ... did not necessarily result in a safety hazard."

The ALJ found that the station could be "relocated by any employee by simply unscrewing the bolt by hand or using a commonplace tool such as a wrench." OSHA alleged, and the ALJ confirmed, that the failure to secure the stand was a violation of 29 C.F.R. § 1910.217(c)(3)(vii)(d), which states: "[t]wo hand controls shall be fixed in position so that only a supervisor or safety engineer is capable of relocating the controls."

The ALJ based his finding on evidence that the two-hand control station "was not consistently bolted in place during operation but also that employees other than supervisors and safety engineers could relocate the stand." Specifically, the ALJ pointed to testimony of one employee, "that sometimes the press control stands were bolted in place during operation and that sometimes they were not and that, as to some presses, there was nowhere to bolt the stands." A team leader testified "that the two-hand control stand for the cited press was never bolted in place and that before the accident there was nowhere to do so." According to the ALJ's decision, "[w]itnesses also testified that even when control stands were bolted in place, supervisors and safety engineers were not the only individuals who could relocate them." Employees also testified that "it was the press operator's responsibility to bolt the stand in place, although it was not always possible to do so, and that supervisors did not check the control stands regularly." The ALJ also found that the stand could be moved by simply unscrewing the bolts, and that there was nothing to impede an employee from unscrewing or moving the stand. The ALJ determined that employees had "access to the violative condition," and that such access "was reasonably predictable." The ALJ also determined that Mayflower "had knowledge of the violative condition or could have had knowledge of the condition through the exercise of reasonable diligence."

Turning to the question of employee misconduct as a defense for Mayflower, the ALJ stated:

> [M]y finding of a violation in this case is not based on the accident but on the witness testimony establishing that employees other than supervisors or safety engineers had relocated the control stand. In any case, to prove the affirmative defense of unpreventable employee misconduct, the employer must show that (1) it had established work rules designed to prevent the violation, (2) it had adequately communicated the rules to its employees, (3) it had taken steps to discover violations, and (4) it had effectively enforced the rules when violations were detected. *Jensen Constr. Co.*, 7 BNA OSHC 1477, 1479 (No. 76–1538, 1979).

Based on the evidence the ALJ determined that Mayflower had not met the first two elements and rejected the affirmative defense.

Finally, the ALJ re-characterized the violation as *de minimis* because it did not have a "direct and immediate relationship to safety or health." Occupational Safety

& Health Act of 1970 § 9(a); 29 U.S.C. § 658(a). While noting that moving the stand too close to the press could have resulted in injury, the ALJ went on:

> On the other hand, any employee could also move the control stand farther away which, although a violation of the standard, would not have created a hazard.... I find that the Secretary has not shown that employee safety and health were compromised by the violation of this standard standing alone.

The Secretary filed for review with the Commission, asking for reversal of the ALJ's finding that the violation was merely *de minimis*. Mayflower filed a Conditional Cross–Petition for Discretionary Review, contending that the injured employee's pre-accident misconduct was improperly rejected as a defense by the ALJ. The Commission rejected the ALJ's determination that the violation was *de minimis*. It quoted *Whiting–Turner Contracting Co.*, 13 O.S.H. Cas. (BNA) 2155, 2156 (1989), that the standard for *de minimis* under 19 U.S.C. § 658(a) is when "there is technical noncompliance with a standard but the violation has such a negligible relationship to safety or health of employees that it is not appropriate to order abatement or assess a penalty." The Commission concluded that nothing in the record indicated that the violation had a negligible relationship to safety. The Commission found that compliance with the standard acts to reduce the possibility of accident. Non-compliance would expose the machine's operator to the hazard. The Commission stated:

> Furthermore, we find that the violation was serious as alleged. Under Commission precedent, a violation is serious if, in the event of an accident, there is a "substantial probability that the result would be death or serious physical harm." *George C. Christopher & Sons, Inc.*, 10 BNA OSHC 1436, 1446, 1982 CCH OSHD ¶ 25,956, p. 32,533 (No. 76–

647, 1982). A serious violation only requires proof that the harm "could have occurred." *Dec–Tam Corp.*, 15 BNA OSHC 2072, 2077, 1991–93 CCH OSHD ¶ 29,942, p. 40,918 (No. 88–523, 1993).

The Commission restored the finding of a "serious" violation and assessed a penalty of $2000.

Mayflower now appeals to this court to vacate the order of the Commission finding a serious violation, or in the alternative to modify and reclassify the violation as *de minimis* consistent with the ruling of the ALJ.

## ANALYSIS

Review by the court of appeals of a Commission decision is limited. Findings of fact are conclusive if supported by substantial evidence on the record. *See Dunlop v. Rockwell Int'l*, 540 F.2d 1283, 1287 (6th Cir.1976). Adjudicatory conclusions of the Commission must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Empire–Detroit Steel Div., Detroit Steel Corp. v. OSHRC*, 579 F.2d 378, 383 (6th Cir.1978). The Court exercises jurisdiction under 29 U.S.C. § 660(a).

A. The Secretary was not required to show actual exposure to a hazardous condition independent of the violation for failure to properly secure a "two-hand control device" for an industrial press.

▇▇▇ Mayflower contends that for the Secretary to establish a violation she must show that "the standard applies to the cited condition, the employer is not in compliance, and the employees were exposed to the hazard." *Nat'l Eng'g & Contracting Co. v. OSHA*, 928 F.2d 762, 767 (6th Cir.1991). Mayflower interprets this phrase to mean that in order to establish a violation, the Secretary must show that the

company was in technical breach of the standard, that an employee operated the machine at the time of the technical breach, and that the employee operated the machine in such a way that he is literally exposed to the ultimate danger the regulation seeks to avoid. In this case that danger is serious bodily injury or death.

The Secretary responds that it is not necessary to establish exposure to the ultimate danger, only to the violation, because the standard at issue presumes a hazard. The Secretary claims she has to show only that the employees worked with the machine during the period of non-compliance.

Two categories of standards exist under the OSHA regulations. While the first requires the Secretary to show actual exposure to a hazardous condition independent of non-compliance with the regulations, the second does not. The first type of standard incorporates the existence of a specified hazard as an element of a violation. *See Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 731 (6th Cir.1980). In *Ray Evers Welding* the regulation required wearing of protective equipment "where there is an exposure to hazardous conditions." *Id.* at 730. The court, rejecting a challenge to the regulation on vagueness grounds, found that the regulation "requires an employer to require wearing the appropriate safety equipment by his employees whenever a reasonably prudent employer, concerned with the safety of his employees, would recognize the existence of a hazardous condition." *Id.* at 731. The Secretary is also required to establish the existence of a hazardous condition in cases arising under the "general duty clause" of § 5(a)(1) of the OSH Act. *See Nat'l Realty and Constr. Co., Inc. v. OSHRC*, 489 F.2d 1257, 1265 (D.C.Cir. 1973). This clause does not list specific types of violations. Instead, the Secretary must prove that the employer failed to

make the workplace free of a hazard, that the hazard was one objectively recognized within the industry, and that the hazard caused or was likely to cause death or serious physical harm. *Id.*

The second type of standard does not require a separate showing of exposure to a hazardous condition independent of the violation of the standard. Such standards "only require the Secretary to show that the employer has not complied with their terms." *Nat'l Eng'g.* 928 F.2d at 768.

> The existence of a hazard is not always an element, however, of the Secretary's burden of proof for showing violation of an OSHA standard. When the violative element is only a condition, hazard is presumed, and the Secretary need only show the existence of the violative condition and worker exposure to the condition.

*Bunge Corp. v. Sec'y of Labor*, 638 F.2d 831, 835 (5th Cir.1981) (citations omitted).

The standard in the regulation at issue is one of the second type. The standard requires that the stand be bolted and that only a supervisor or safety engineer be able to move it. Failure to comply would create a risk of accident where the employees could move the stand closer to the press. The standard does not require a separate finding of a hazard; the hazard is the free movement of the stand. In fact, *National Engineering*, which Mayflower relies on for the proposition that the Secretary must always show that employees were exposed to an actual hazard, explicitly rejected Mayflower's argument:

> The appellants do not contest the existence of the cited condition. They argue, however, that the conditions do not violate OSHA's standards because their equipment, despite the conditions, is safe for employee use.... [Appellants] cannot escape liability by claiming that they do not believe their failure to com-

ply with the language of the regulations constitutes a violation. 928 F.2d at 768.

From the case law and regulations, it is clear that the Secretary need not show that any specific employee actually operated the machine in such a reckless way that he was exposed to the exact harm the regulation seeks to prevent in order to prove a violation of the standard. She merely has to show that the violation occurred. The hazard (increased possibility of accident) is presumed by the standard, and the Secretary need not show additional danger to establish a violation. Mayflower stated in its brief, "the cited standard literally requires that an employer must fix the press controls so that only a supervisor or safety engineer is capable of relocating them." Mayflower has produced no evidence, nor did it dispute that it was not in compliance with what the standard "literally requires." The Commission determined that Mayflower violated the standard; that finding is supported by substantial evidence and in accordance with law.

B. The OSH Review Commission's finding of a "serious violation" was based on substantial evidence.

■ Mayflower next claims that even if a violation occurred, it does not qualify as a "serious violation." Section 17(k) of the OSH Act (codified at 29 U.S.C. § 666(k)) details the requirements for proving a serious violation:

> For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could

not with the exercise of reasonable diligence, know of the presence of the violation.

To find a serious violation the Secretary need not show that an accident was probable, only that an accident was possible. *Shaw Constr. Inc. v. OSHRC*, 534 F.2d 1183, 1185 (5th Cir.1976) (Violations are "serious if they make possible an accident involving a substantial probability of death or serious physical harm."). As discussed, *supra*, exposure to a hazard is presumed by this regulation. The Secretary does not need to establish that employees operated the machinery in the most dangerous way possible, only that they were exposed to the hazard as defined by the standard. *California Stevedore & Ballast Co. v. OSHRC*, 517 F.2d 986, 988 (9th Cir.1975) ("Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation.").

The Commission stated in its findings that "[m]oving the controls too close to the press point of operation would clearly expose the machine's operator to the hazard posed by the point of operation. The standard operates to reduce that possibility."

Mayflower counters that the Secretary did not show even the possibility of an accident occurring. Mayflower cites to ALJ decisions which indicate that a violation will be reduced to *de minimis* if the evidence indicates that an accident was not possible. Under the regulation at issue in this case, that would mean that the record does not support a finding that the free movement of the stand "allowed the operator to place his hands into the point of operation." *General Motors Corp., Chevrolet Motor Div.*, 8 O.S.H. Cas. (BNA) 1574 (1980).

Mayflower argues that to determine whether an accident is possible it is necessary to look to the entire section of the

regulation at issue. Mayflower argues that possibility in this case means that an employee could operate the machine while in a "zone of danger." It argues the zone of danger is defined by the regulation as the safety distance required by regulations in § 1910.217(c)(3)(vii)(c):

(c) The safety distance ($D_s$) between each two hand control device and the point of operation shall be greater than the distance determined by the following formula:

$D_s = 63$ inches/second X $T_s$;

where:

$D_s$=minimum safety distance (inches); 63 inches/second=hand speed constant; and

$T_s$=stopping time of the press measured at approximately 90 position of crankshaft rotation (seconds).

Mayflower's expert witness, Richard Hayes, testified that the safety distance from the point of operations (also called a pinch point) to the control stand for the OBI 200 machine at issue is between fourteen and three-quarters inches and fifteen and a half inches. Mr. Hayes went on to say that it would be difficult to operate the press, even if it was within the fifteen inch range, because the operator would "have an overlap of the press table itself." May-

flower points out that the OSHA compliance officer, Bruce Bingham, did not take any measurements to determine whether, if the stand were pushed up against the press, it would have been within the safety distance.

The regulations do not require that all of the provisions of the subsection be violated for any one of them to qualify as serious. Each of the provisions acts to reduce the possibility of an accident and protect the operator.[1] A violation of two of the provisions at the same time may increase the chance of an accident from mere possibility to probability. However, a violation of any of the provisions which creates the possibility of an accident involving a substantial probability of serious injury is sufficient to justify the Commission's determination of a serious violation.

In this case there is substantial evidence to support the Commission's finding that an accident was possible. While it is true that Mr. Bingham did not calculate the distance, he did determine that it was possible to operate the machine with one hand and one knee on the stand, leaving one hand free, and making it possible for the operator to place his hand inside the point of operation. No witness, including Mr. Hayes, disputed this testimony. Mr.

1. Under § 1910.217(c)(3)(i) the purpose of the rule is explained:

(3) Point of operation devices.
(i) Point of operation devices shall protect the operator by:
(a) Preventing and/or stopping normal stroking of the press if the operator's hands are inadvertently placed in the point of operation; or
(b) Preventing the operator from inadvertently reaching into the point of operation, or withdrawing his hands if they are inadvertently located in the point of operation, as the dies close; or
(c) Preventing the operator from inadvertently reaching into the point of operation at all times; or
(d) [Reserved]

(e) Requiring application of both of the operator's hands to machine operating controls and locating such controls at such a safety distance from the point of operation that the slide completes the downward travel or stops before the operator can reach into the point of operation with his hands; or
(f) Enclosing the point of operation before a press stroke can be initiated, and maintaining this closed condition until the motion of the slide had ceased; or
(g) Enclosing the point of operation before a press stroke can be initiated, so as to prevent an operator from reaching into the point of operation prior to die closure or prior to cessation of slide motion during the downward stroke.

Hayes, in fact, stated that if the stand were pressed right up against the machine operation would be "difficult," but he did not say that it was impossible. The testimony of other employees was inconsistent with Hayes' testimony that operating the machine at such a close distance was difficult. Harry Stewart, an employee team leader, testified that the stand "was always pushed against the OBI. That's how [Mayflower employees] ran it." Melvin Gibson, a supervisor, stated that he was "sure" he had seen someone operate the power press with the palm button stand within twelve inches of the pinch point.[2] The evidence on the record supports the conclusion that the stand could be pushed up against the press, within the fifteen inch range, and, that even though such operation might be difficult, it could be operated in this manner. The evidence also supports the conclusion that the stand could be located a few inches farther, but that employees could still reach in to the point of operation with a free hand.

Having established the possibility of an accident, the Commission found that if the stand were close enough to the press, "the result of any such contact, as the Secretary's witness testified, could be crushing or amputation." These potential injuries clearly fall within the meaning of "serious physical harm." Mayflower does not dispute that, if an accident did occur, there was a substantial probability a serious injury would result. Therefore, there is substantial evidence to support the Commission's finding of a serious violation.

C. Appellant was not improperly prevented by the ALJ from establishing an affirmative defense of employee misconduct.

▇ Mayflower argues that the ALJ improperly denied it the ability to put into evidence that the accident that triggered the investigation was caused by unforeseeable employee misconduct, because the employee in question was under the influence of cocaine use. Mayflower claims the ALJ's denial prevented it from making out an affirmative defense of "unforeseeable employee misconduct." However, this is irrelevant to the ALJ's finding that the stand could be moved by persons other than supervisors or safety engineer.[3] As Mayflower admits, the injury suffered by Mr. Asturi "played no part in the trial or the ALJ's consideration of the cited standard."

Further, the ALJ addressed the possibility of Mayflower relying on this affirmative defense, and found that even if evidence of Mr. Asturi's conduct were included in the record, Mayflower could not establish the requisite elements for the defense. Specifically, the ALJ found that Mayflower did not have established work rules designed to prevent the violation, and it did not adequately communicate

---

2. Mr. Gibson at a later point appeared to contradict that it was twelve inches, saying that for the OBI 200 press in question that the distance was eighteen inches. However, even if the distance is eighteen inches it does not contradict Mr. Bingham's testimony that an operator could reach the pinch point from the press stand. Gibson also clarified that he had seen someone operate the OBI 200 press with the stand affixed "close to the press" contradicting Hayes' testimony that operating the machine at a close distance would be difficult.

3. The ALJ stated: "However, I need not resolve whether [Asturi] operated the press without authorization. Although the accident triggered the OSHA inspection, my finding of a violation in this case is not based on the accident but on the witness testimony establishing that employees other than supervisors or safety engineers had relocated the control stand." (footnote omitted).

those rules to its employees. These are two of the four elements of the affirmative defense. The other two are that it took steps to discover violations, and it effectively enforced the rules when violations were detected. *See, e.g., Brock v. L.E. Myers Co., High Voltage Div.,* 818 F.2d 1270, 1277 (6th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 479, 98 L.Ed.2d 509 (1987) (holding that "the employer who wishes to rely on the presence of an effective safety program to establish that it could not reasonably have foreseen the aberrant behavior of its employees must demonstrate that program's effectiveness in practice as well as in theory.")

Finally, the Commission, like the ALJ, did not rely on any "pre-accident misconduct" by the employee in its finding of a serious violation. Mr. Asturi's conduct is not relevant to the Commission's findings, and it was not improper for the ALJ or Commission to deny Mayflower the chance to offer evidence that was irrelevant to the finding of a violation.

## CONCLUSION

For the foregoing reasons the decision of the Commission is affirmed.

