**DEPARTMENT OF LABOR, now Kentucky Labor Cabinet, Appellant,**

v.

**MOREL CONSTRUCTION CO., INC.; Midwest Steel, Inc.; East Iowa Deck Support, Inc.; and Kentucky Occupational Safety and Health Review Commission, Appellees.[1]**

No. 2010–CA–000193–MR.

Court of Appeals of Kentucky.

Jan. 28, 2011.

Case Ordered Published by Court of Appeals March 25, 2011.

Rehearing Denied April 25, 2011.

Discretionary Review Denied by Supreme Court March 14, 2012.

---

1. The term "Appellees," as it is used in the analysis of this opinion, refers to Morel Construction Co., Inc., Midwest Steel, Inc., and East Iowa Deck Support, Inc. The Kentucky Occupational Safety and Health Review Commission was named as an "appellee," but is not strictly speaking an appellee or adversary in the proceedings because it is bound to enforce its statutory mandate, as written. However, this Commonwealth has long recognized standing of administrative entities to challenge decisions contrary to its own. *See, e.g., Boyd & Usher Transp. v. S. Tank Lines, Inc.*, 320 S.W.2d 120 (Ky.1959) (holding that the Department of Motor Transportation could represent the public interest and was a proper party); *Ky. State Racing Comm'n v. Fuller*, 481 S.W.2d 298 (Ky.1972) (the Kentucky State Racing Commission was an aggrieved party and had standing to challenge a circuit court's decision).

James R. Grider, Jr., Frankfort, KY, for appellant.

Ann K. Guillory, Louisville, KY, Glenn J. Fuerth, New York, NY, for appellees, Midwest Steel, Inc., and East Iowa Deck Support, Inc.

Robert J. Schumacher, Louisville, KY, for appellee, Morel Construction, Inc.

Frederick G. Huggins, Frankfort, KY, for appellee, Kentucky Occupational Safety and Health Review Commission.

Before CAPERTON, MOORE, and VANMETER, Judges.

*OPINION*

MOORE, Judge:

Appellee, Morel Construction Company, Inc., performed work at a site located at the Kentucky state fairgrounds in Louisville. It subcontracted roofing work to Appellee, Midwest Steel, Inc., which in turn subcontracted to Appellee, East Iowa Deck Support, Inc. Four East Iowa employees worked at a height of 42 feet, installing large rectangular pieces of sheet metal decking, each measuring thirty feet by three feet, to make a flat roof. An inspecting compliance officer with the Kentucky Labor Cabinet visited the work site, observed the four East Iowa employees on the flat roof, and cited Morel Construction Company, Inc., Midwest Steel, Inc., and East Iowa Deck Support, Inc., Appellees, for serious violations of standards promulgated under the authority of the Kentucky Occupational Safety and Health Act (KOSHA), Kentucky Revised Statutes (KRS) 338.011 through 338.991.

The two standards at issue in this matter both apply to steel erection. The first citation, referred to as "citation 1, item 1," related to the failure of East Iowa employees to wear and utilize fall protection equipment as mandated in 803 Kentucky Administrative Regulation (KAR) 2:417 § 3(1)(b). The second, referred to as "citation 1, item 2," related to an alleged failure of East Iowa's employees to follow the standard for installing metal decking, set forth in 29 Code of Federal Regulation (C.F.R.) § 1926.754(e)(5)(i).[2] These respective citations were consolidated for review before Kentucky's Occupational Safety and Health Review Commission. In an October 7, 2008 opinion and order, the Commission affirmed that these citations reflected KOSHA violations and classified these violations "serious," per KRS 338.911. However, in its subsequent review, and pursuant to a December 30, 2009 opinion and order, the Franklin Circuit Court reclassified the Appellees' violation of the standard set forth in 803 KAR 2:417 § 3(1)(b) as "other than serious." Also, the circuit court vacated the alleged violation of 29 C.F.R. § 1926.754(e)(5)(i) because it found that the method of installation utilized by the Appellees complied with that standard.

The Cabinet now appeals the opinion and order of the Franklin Circuit Court. After careful review, we find that the circuit court erred both in reclassifying the former violation to "other than serious," and in vacating the latter. To that extent, we reverse the circuit court's decision. Additional facts will be addressed, as they become relevant, within our analysis of each citation.

**STANDARD OF REVIEW**

In reviewing an agency decision the reviewing court may only overturn that

---

**2.** 29 C.F.R. § 1926.754(e)(5)(i) has been adopted by reference as a KOSHA standard, pursuant to KRS 338.061(2). *See* 803 KAR 2:417 § 2(1).

decision if the agency acted arbitrarily or outside the scope of its authority, if the agency applied an incorrect rule of law, or if the decision itself is not supported by substantial evidence on the record. *Ky. State Racing Comm'n v. Fuller,* 481 S.W.2d 298, 300–301 (Ky.1972). When reviewing issues of law, the court may review them *de novo* without any deference to the agency. *Mill St. Church of Christ v. Hogan,* 785 S.W.2d 263, 266 (Ky.App.1990).

██ On questions of fact, the court's review is limited to an inquiry of "whether the agency's decision was supported by substantial evidence or whether the decision was arbitrary or unreasonable." *Cabinet for Human Res., Interim Office of Health Planning and Certification v. Jewish Hosp. Healthcare Serv., Inc.,* 932 S.W.2d 388, 390 (Ky.App.1996). Substantial evidence means "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens–Corning Fiberglas v. Golightly,* 976 S.W.2d 409, 414 (Ky. 1998).

██ If there is substantial evidence in the record to support the agency's findings, the court must defer to those findings even though there is evidence to the contrary. *Ky. Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981). Likewise, a court may not substitute its own judgment as to the inferences to be drawn from the evidence of record for that of the administrative agency. *Railroad Comm'n v. Chesapeake & Ohio Ry.,* 490 S.W.2d 763, 766 (Ky.1973). If the court finds the rule of law was applied to facts supported by substantial evidence, the final order of the agency must be affirmed. *Brown Hotel Co. v. Edwards,* 365 S.W.2d 299, 302 (1963). The function of the court in administrative matters "is one of review, not of reinterpretation." *Ky. Unemployment Ins. Comm'n v. King,* 657 S.W.2d 250, 251 (Ky.App.1983).

## ANALYSIS

We begin with a discussion of how Kentucky law interprets KOSHA. KOSHA is patterned after its federal counterpart, the Federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C.A. §§ 651–678 (2001). By way of background,

> [t]he Occupational Safety and Health Act's stated purpose is to provide "so far as possible every working man and woman in the Nation safe and healthful working conditions...." *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 12, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). Its purpose is neither punitive nor compensatory, but rather forward-looking; *i.e.,* to prevent the first accident. *Mineral Industries & Heavy Construction Group, v. OSHRC,* 639 F.2d 1289, 1294 (5th Cir.1981). To implement the statutory purpose, Congress imposed dual obligations on employers to comply both with a "general duty clause" requiring that the employer free the workplace of all recognized hazards, 29 U.S.C. § 654(a)(1), and a "special duty clause" which requires compliance with mandatory occupational safety and health standards issued by the Secretary, 29 U.S.C. § 654(a)(2).

*Brock v. L.E. Myers Co., High Voltage Div.,* 818 F.2d 1270, 1275 (6th Cir.1987).

KOSHA tracks the Federal Act in most respects and, pursuant to KRS 338.061(2), the Kentucky Occupational Safety and Health Standards Board is authorized to adopt federal standards for occupational safety and health as KOSHA standards. The Kentucky Supreme Court has interpreted the two Acts consistently, and we have often turned to Federal decisions for guidance in interpreting KOSHA. *See Ky. Labor Cabinet v. Graham,* 43 S.W.3d 247, 253 (Ky.2001); *see also Lexington–Fayette*

*Urban County Gov't v. Offutt,* 11 S.W.3d 598 (Ky.App.2000) (finding federal law persuasive authority to determine whether there had been a violation of KRS 338.031). At issue in this matter is KOSHA's own special duty clause, KRS 338.031(1)(b), which requires that "[e]ach employer ... [s]hall comply with occupational safety and health standards promulgated under this chapter." It is identical to OSHA's special duty clause, stated in 29 U.S.C. § 654(a)(2). As noted, the special duties, or standards, at issue in this matter are 803 KAR 2:417 § 3(1)(b) and 29 C.F.R. § 1926.754(e)(5)(i).

The only issues to be resolved in this appeal are: 1) whether the circuit court properly reclassified the citation 1, item 1 violation from "serious" to "other than serious"; and 2) whether the circuit court correctly determined that the Appellees' method of installing metal decking complied with the standard contained in 29 C.F.R. § 1926.754(e)(5)(i). Morel, Midwest, and East Iowa chose not to appeal the circuit court's decision, which affirmed that 1) their affirmative defense of employee misconduct is without merit; 2) Morel and Midwest are liable with East Iowa for East Iowa's violations under Kentucky's multi-employer doctrine; and 3) East Iowa, through its employees, did violate 803 KAR 2:417 § 3(1)(b), as stated in citation 1, item 1.[3]

## 1. RECLASSIFICATION OF CITATION 1, ITEM 1, FROM "SERIOUS" TO "OTHER THAN SERIOUS."

Before we describe the facts leading up to this violation and address the propriety of the circuit court's decision to reclassify it, some context is necessary. This context includes a discussion of 1) what the Cabinet must prove to establish a KOSHA violation in general; 2) how a KOSHA violation is classified after it has been established by the Cabinet; and 3) how a penalty for a KOSHA violation is calculated, after it has been established and classified.

■ As to the first matter, to establish a *prima facie* case for either a serious or other than serious KOSHA violation under the special duty clause of KRS 338.031(1)(b), the Cabinet bears the burden of proving, by a preponderance of the evidence, that (1) the cited standard applies to the facts; (2) the requirements of the standard were not met; (3) employees had access to the hazardous or violative condition (*i.e.,* a violative or hazardous condition existed, and employees were exposed to it); and (4) the employer knew or could have known of the hazardous condition with the exercise of reasonable diligence. *See Ky. Labor Cabinet v. Emerson Power Transmission Corp.,* No. 2004–CA–000015–MR, 2004 WL 2984887 (Ky.App., Dec. 23, 2004) (unpublished), cited herein pursuant to CR 76.28(4)(c). This approach is consistent with the federal interpretation of 29 U.S.C. § 654(a)(2). *See, e.g., Mayflower Vehicle Sys., Inc. v. Chao,* 68 Fed.Appx. 688, 691 (6th Cir.2003); *Carlisle Equip. Co. v. U.S. Secretary of Labor & Occupational Safety,* 24 F.3d 790, 792–793 (6th Cir.1994).[4]

Turning next to the issue of classifying a violation as either serious or other than

---

**3.** The circuit court's order itself recites that "The finding of a violation of 803 KAR 2:417, section [3](1)(b) by East Iowa employees is uncontested."

**4.** KOSHA itself does not define a "nonserious violation" because KOSHA is largely a replication of OSHA, and OSHA does not define what a "nonserious violation" is either. Shortly after OSHA was first promulgated, the issue of what constituted a "nonserious violation" arose and the above four elements resulted; they were derived from an analysis of the prior version of 29 U.S.C. 666(k), the

serious, KRS 338.991(11) provides, in relevant part:

> As used in this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one (1) or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment....[5]

■ Interpreting OSHA's identical federal rule, 29 U.S.C. § 666(k), the Federal Occupational Safety and Health Review Commission (OSHRC) has stated that "substantial probability of death or serious physical harm" does not refer to the issue of whether an accident is likely to occur. Rather, the issue in classifying a violation as "serious" is whether the injury that could possibly result from an employee's exposure to a hazard would likely be seriously harmful or fatal. *Secretary of Labor v. Soltek Pac.*, 20 O.S.H.C. 2095, 2096 (2004); *see also Secretary of Labor v. Dunco, Inc.*, 18 O.S.H.C. 1149, 1153 (1997) (holding that because employees were exposed to a fall hazard of approximately eighty feet, expected harm would be serious injury or death). Stated differently: "[T]he seriousness of the violation depends on the hazard produced by the condi-

tion[.]" *Bunge Corp. v. Secretary of Labor*, 638 F.2d 831, 834 (5th Cir.1981).

Finally, we turn to the issue of how a penalty for a KOSHA violation is calculated after a violation has been established and classified. In *Secretary of Labor v. Seedorff Masonry, Inc.*, 21 O.S.H.C. 1510, 1512 (2006), OSHRC explained:

> In determining the penalty [for a violation] the Commission is required to give due consideration to the size of the employer, the gravity of the violation and the employer's good faith and history of previous violations. The gravity of the offense is the principle [sic] factor to be considered. Factors to be considered in determining the gravity of the violation include: (1) the number of employees exposed to the risk of injury; (2) the duration of exposure; (3) the precautions taken against injury, if any; and (4) the degree of probability of occurrence of injury.
>
> ....
>
> Where the low gravity of a violation is the overriding factor, a penalty of as little as $100.00 has been deemed appropriate for a "serious" violation.

KOSHA regulations require penalties for KOSHA violations to be calculated based upon the same factors described in

---

identical federal counterpart of KRS 338.991(11), defining what a "serious violation" is. The federal courts determined that although the fourth of the above-stated elements appears only in the definition of a "serious violation," the Act intended for the knowledge and diligence of an employer to be an element essential to proving all OSHA violations, serious or otherwise, because, as the federal courts found, the purpose and intent of OSHA is aimed at providing working men and women safe and healthful working conditions so far as possible, and that it was not aimed at making an employer the insurer of, and strictly liable for, the safety of all employees. For thorough discussions on this

subject, *see, e.g., Dunlop v. Rockwell Intern.*, 540 F.2d 1283 (6th Cir.1976); *Brennan v. OSHRC*, 511 F.2d 1139, 1143–1145 (9th Cir. 1975).

5. The remainder of this rule, *i.e.*, "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation," is essential to the issue of establishing a violation; it is not relevant to the issue of classifying a violation. *See supra*, note 4. The circuit court affirmed that the Appellees violated 803 KAR 2:417 § 3(1)(b), and the Appellees filed no appeal to its decision.

*Seedorff Masonry. See, e.g.,* 803 KAR 2:115 § 1(2).

With this context in mind, we turn to the circumstances surrounding the violation described in citation 1, item 1. We begin with an overview of this violation, as described in the Commission's order:

In its citation 1, item 1, issued to all three employers the department of labor charged a violation of 803 KAR 2:417, section 1(1)(b) [subsequently renumbered 803 KAR 2:417, section 3(1)(b)]; the standard says:

Each employee engaged in a steel erection activity who is on a walking/working surface with an unprotected side or edge ten (10) feet or greater above a lower level shall be protected from fall hazards by guard rail systems, positioning device systems, or fall restraining systems.

Serious citation 1 said "Four employees were installing metal decking for a roof of the South Wing C expansion, approximately 42 feet from the ground with no fall protection." Exhibit 4. The four employees worked for East Iowa.

East Iowa began the roofing work on August 2, 2004. CO [Compliance Officer] Bendorf determined the employees worked 42 feet above the ground on the roof under construction. Hearing Officer Head found the compliance officer on August 17, 2004, the date of the inspection, observed East Iowa's Foreman Dale McAtee working on the roof without a fall protection harness. The CO's observation was confirmed by testimony from East Iowa employees. For this case, fall protection is a full body harness with a retractable lanyard which can be attached to the structure to prevent falls from height.

Aaron Jordan, an East Iowa roofing employee, admitted he worked without fall protection on August 17. He said "I will admit that, yes." He said a fifty foot retractable steel cable, used to prevent falls when attached to the harness, was approximately ¼ inch in diameter. When tied off, Mr. Jordan used the ¼ inch cable. During his examination Mr. Jordan was shown fifteen photographs taken by the compliance officer; Jordan said he could not tell from the photographs if he was connected to the cable.

Foreman McAtee, when examined by the hearing officer said, "No, I didn't have my harness on." He said Mr. Wakeland, another East Iowa employee, did not have his harness on either.

In these cases the secretary of labor carries the burden of proof. Section 43(1), 803 KAR 50:010. For the secretary to establish a violation he must prove the standard applies to the cited condition, the employer violated the standard, and employee had access to the cited condition and the employer knew, or with the exercise of reasonable diligence, could have known of the violative condition. [*Secretary of Labor v.*] *Astra Pharmaceutical Products, Inc.,* CCH [1981] O.S.H.D. 25,578, pages 31,-899–31,900, BNA 9 O.S.H.C. [2126] 2129. Here East Iowa performed steel erection at a height of 42 feet. East Iowa's foreman Dale McAtee and at least two of his employees, with his knowledge, worked on the 42 foot roof without fall protection even though the standard requires protection at 10 feet. 803 KAR 2:417, section 3(1)(b). The steel erection standard applies because the East Iowa employees were installing the sheet metal roofing on a steel structure. Thus, the only remaining issue is whether the employers knew of the violation or could have known with the exercise of reasonable diligence. Employer knowledge can be proven by actual or constructive knowledge. Because East Iowa em-

ployed the four roofers while Morel and Midwest Steel had no employees with access to the hazard of falling but were instead controlling employers, their situations are somewhat dissimilar.

(Internal citations and footnotes omitted.)

The remaining portion of the Commission's order, as it related to whether the Cabinet established a violation of 803 KAR 2:417 § 3(1)(b), held that knowledge of this violation was properly imputed to each of the Appellees because (1) Kentucky law considered each of the Appellees to be the employers of East Iowa's employees under Kentucky's multi-employer doctrine; (2) Foreman McAtee was in charge of supervising himself and the other employees; and (3) McAtee allowed himself and the other employees to go without fall protection. Thus, the Commission held that the evidence sufficiently supported that the Cabinet had established each of the elements necessary for proving a violation of the standard. Furthermore, the Commission held that the Appellees had failed to prove employee misconduct as an affirmative defense to any citation at issue in this matter.

After the Commission addressed whether the Cabinet had proven that the Appellees had violated 803 KAR 2:417 § 3(1)(b), the Commission proceeded to classify the violation, per KRS 338.991(11). Here, the Commission considered the hazard contemplated by the standard, namely, the danger of an employee falling off of an unprotected edge ten feet tall or higher. The Commission held that a fall from a height of 42 feet was likely to cause death or serious bodily harm. As such, the Commission classified the violation as "serious," per the statute.

Finally, the Commission addressed the issue of how the penalty for the violation should be properly calculated. The Commission noted that the parties to this matter did not make penalty calculation an issue for the Commission to review. As such, the Commission affirmed the penalties assessed by the KOSHA compliance officer: $2,500 for East Iowa, $4,500 for Midwest Steel and $3,000 for Morel Construction.

When the Appellees sought review of the Commission's decision before the circuit court, they did not raise the issue of how the Commission calculated their respective penalties, nor did they contest that Kentucky's multi-employer doctrine considered each of them to be controlling employers of East Iowa's employees. Rather, the Appellees argued, first, that the Commission erred when it held that they had failed to prove the affirmative defense of employee misconduct and that, on that basis, this citation should be vacated. Alternatively, the Appellees argued:

In the event that the Court does not find that Midwest Steel and EID established the affirmative defense of unforeseeable worker misconduct/rogue supervisor, it should reverse the Review Commission and reduce the violation type from "Serious" to "Other–Than–Serious." The Court can take judicial notice that the FOM [KOSHA field operating manual] classifies a "Serious" violation as one where "there is a substantial probability that death or serious physical harm could result...."

Since Mr. Bendorf observed the EID crew from approximately 300 yards away, he was unable to estimate how close the crew members were from the leading edge. In other words, he could not provide a definable distance for close proximity to a leading edge constituting a hazard. Moreover, Mr. Bendorf admitted that there was no definition of "close proximity" of the leading edge in the subpart of the standard. Finally, he admitted that he could not define what

distance from the leading edge would constitute a "lesser probability" of harm. Conversely, Mr. McAtee testified that the area of the roof where he and Mr. Wakeland were working without being tied off was "away from any fall hazards."

The secretary has failed to establish that the hazard at issue concerning the infractions by Mr. McAtee and Mr. Wakeland support a "Serious" violation.

(Internal citations and footnotes omitted.)

In sum, the Appellees also argued that the circuit court should affirm that they violated 803 KAR 2:417 § 3(1)(b), but classify this violation as "other-than-serious," rather than a "serious." They contended the Cabinet had failed to prove that any East Iowa employee was actually exposed to a violative condition, or hazard, as contemplated by the regulation.

In its own review of this citation, the circuit court found that the Commission had correctly determined that the Appellees had failed to prove their affirmative defense of employee misconduct. The circuit court also affirmed the Commission's finding that Morel, Midwest, and East Iowa violated the fall protection standard set forth in 803 KAR 2:417 § 3(1)(b). However, the circuit court was persuaded by the Appellees' alternative argument, and reversed the Commission's determination that the violation was properly classified as "serious," per KRS 338.991(11). The portion of the circuit court's order explaining its reasoning states:

Appellants[6] argue that the Compliance Officer, who observed the EID crew from about 300 yards away, was not able to estimate how close the crew members were to the leading edge. The Compliance Officer testified that he could not define what distance from the leading edge would constitute a "lesser probability" of harm. Appellants also note that Mr. McAtee testified that the area of the roof where he and the other roofers were working without being tied off was "away from any fall hazards." This seems to the Court to detract from the weight of the Review Commission's evidence regarding the seriousness of the violation. While substantial evidence is "something less than the weight of the evidence," we [sic] find that there is not substantial evidence in the record to support the Review Commission's finding. The Court, therefore, reverses the Review Commission's determination that the fall protection violation was a serious violation for the purposes of KRS 338.991(11) and remands for a determination of a proper penalty.

In short, the circuit court held that the Appellees' violation of 803 KAR 2:417 § 3(1)(b) was not properly classified as "serious" because, as it reasoned, the evidence was insufficient to prove that an employee was actually exposed to a fall hazard, and because, as it found, the evidence did not demonstrate more than a low degree of probability that an injury would occur.

██ On appeal, the Cabinet asserts that an employee's exposure to a hazard or violative condition is relevant to the issue of establishing a violation in general and that the degree of probability that an injury actually would occur is relevant to the issue of determining a penalty for a violation. But, the Cabinet also asserts that neither factor has any bearing upon the issue of whether a violation should be classified as "serious," per KRS 338.991(11),

---

**6.** "Appellants," as the term is used in the circuit court's order, refers to Morel, Midwest, and East Iowa.

and that the circuit court misapplied the law when it turned to these factors to determine whether the violation of 803 KAR 2:417 § 3(1)(b) was properly classified as "serious." We agree.

As noted above, an employee's exposure to a hazardous or violative condition is the thrust of the third element that the Cabinet is required to prove in order to establish any violation of a KOSHA standard and, as such, it is essential to proving the *existence* of a violation, not in classifying it. OSHRC decisions have conclusively established that unless the Secretary meets its burden of proving that employees were "exposed" to conditions violative of the Act, the employer is entitled to have the citation vacated. *See, e.g., Secretary of Labor v. Evergreen Techs., Inc.,* 18 O.S.H.C. 1528, 1529 (1998) (Secretary did not meet burden of proof, and citation was therefore vacated, because Secretary failed to establish that operation of machine that caused injury required employees to be exposed to zone of danger); *Secretary of Labor v. Davis Bros. Constr. Co.,* 20 O.S.H.C. 1315 (2003) (vacating citation because the only evidence the Secretary adduced of exposure to an 8–foot fall hazard was a single photograph, and nothing was known about the unidentified employee in the photograph, including whether he was photographed while in the course of his assigned work duties.)

▆▆▆▆ OSHRC has taken the position that the Secretary may establish exposure to a violative condition by showing that employees were actually exposed to a hazard, or by showing that access to the hazard was reasonably predictable. *See Secretary of Labor v. Caretti, Inc.,* 21 O.S.H.C. 1337, 1339 (2005) (Secretary failed to prove exposure since work had been completed in area where violation occurred); *Secretary of Labor v. Centimark Roofing Sys.,* 21 O.S.H.C. 1309, 1313

(2005); *Secretary of Labor v. Sam Houston Elec. Coop., Inc.,* 19 O.S.H.C. 1982, 1984 (2002); *R. Williams Constr. Co. v. OSHRC,* 464 F.3d 1060, 1064 (9th Cir. 2006) (violation of safe egress requirement of 29 C.F.R. § 1926.651(c)(2) is established when employees have access to zone of danger regardless of whether they were exposed to actual danger); *Secretary of Labor v. Buffets, Inc.,* 21 O.S.H.C. 1065, 1066 (2005) (Secretary must show that employees are in fact exposed to hazard as a result of the manner in which machine functions and is operated). Reformulated, the question is whether employees will be, are, or have been within the zone of danger. The "zone of danger" is determined by the hazard presented by the violative condition, and is normally the area surrounding the violative condition presenting the danger to employees that the standard is intended to prevent. *Secretary of Labor v. Sanderson Farms, Inc.,* 22 O.S.H.C. 1400, 1404 (2008), *petition for review denied* 22 O.S.H.C. 1889, 348 Fed.Appx. 53 (5th Cir.2009); *Secretary of Labor v. Caretti, Inc.,* 21 O.S.H.C. 1294, 1296 (2005); *Secretary of Labor v. Duro–Last, Inc.,* 19 O.S.H.C. 2024, 2027 (2002); *Secretary of Labor v. Sam Houston Elec. Coop., Inc.,* 19 O.S.H.C. 1982, 1985 (2002); *Secretary of Labor v. Rio Doce Pasha Terminal L.P.,* 19 O.S.H.C. 1084, 1085 (2000) (employees were in zone of danger because steel plates being hoisted would not necessarily fall straight down, but could ricochet); *Secretary of Labor v. Beaver Plant Operations, Inc.,* 18 O.S.H.C. 1972, 1975 (1999). OSHRC has adopted the view that the Secretary need not establish the exposed employees' exact position or even have evidence of actual employee exposure, but must show only that it is reasonably predictable that employees have been, are, or will be within the zone of danger. *Secretary of Labor v. B & N & K Restoration Co.,* 22 O.S.H.C. 1241, 1248 (2008);

*Secretary of Labor v. S&G Packaging Co.,* 19 O.S.H.C. 1503, 1506 (2001); *Secretary of Labor v. D.T. Constr. Co.,* 19 O.S.H.C. 1305, 1308 (2000) (frequent operation of laser in areas where employees were working and moving about made it reasonably likely that employees would enter zone of danger); *Secretary of Labor v. A.E. Staley Mfg. Co.,* 19 O.S.H.C. 1199, 1207 (2000); *Secretary of Labor v. IBP, Inc.,* 18 O.S.H.C. 1662, 1662 (1998); *Secretary of Labor v. Fishel Co.,* 18 O.S.H.C. 1530, 1531 (1998). Reasonable predictability requires more than a hypothetical possibility of exposure, though less than a certainty. *A.E. Staley Mfg. Co.,* 19 O.S.H.C. at 1207. For instance, OSHRC has determined that exposure to a hazard is not established when employees have sufficient space to walk past unguarded machinery, so that contact with the hazardous condition, while possible, is unlikely. *Secretary of Labor v. Trinity Indus., Inc.,* 19 O.S.H.C. 1351, 1352 (2001). *See also, Secretary of Labor v. Idaho Trout Processors Co.,* 19 O.S.H.C. 1356, 1358 (2001) (fact that it is not impossible for employee to insert hands into machinery does not itself show that employee is exposed).

Within the context of a fall hazard, which the standard of 803 KAR 2:417 § 3(1)(b) is designed to prevent, OSHRC has found that employees working on a roof were not exposed to hazards under OSHA's fall protection standard where they were kept twenty to thirty feet away from areas where there was no wall, and where their work did not require them to walk near the unprotected areas. *Secretary of Labor v. HST Roofing, Inc.,* 19 O.S.H.C. 1965, 1966 (2002). Conversely, OSHRC has held that a fall protection standard was violated despite a general contractor's instruction to workers to stay seven feet away from an unprotected edge, because the nature of their work required

them to get closer to the edge. *Secretary of Labor v. S. E. Johnson Cos.,* 19 O.S.H.C. 1988, 1991 (2002); *see also Brennan v. OSHRC,* 513 F.2d 1032, 1038 (2d Cir.1975) (holding that an employee working 10 to 15 feet from an unguarded platform edge was "exposed" to an occupational safety hazard). OSHRC has stated that "[i]t is generally not difficult to prove exposure to a fall hazard, since the Secretary need only prove that an employee had access to the zone of danger, and not actual exposure to the hazard itself. But, some specific evidence regarding the employee who was allegedly exposed must be adduced." *Davis Bros. Constr. Co.,* 20 O.S.H.C. at 1320.

The standard of 803 KAR 2:417 § 3(1)(b) presupposes that "a walking/working surface with an unprotected side or edge ten (10) feet or more above a lower level" presents a hazard that an employee without fall protection may fall from that edge. The Commission held that Morel, Midwest, and East Iowa violated 803 KAR 2:417 § 3(1)(b) because it found each of the required elements of a violation were present, including the requirement that employees were exposed to a walking/working surface with an unprotected side or edge ten feet or more above a lower level, *i.e.,* that employees were within its "zone of danger" or proximity. If the circuit court believed that the evidence of record was insufficient to support that an employee without fall protection was within zone of danger presented by an unprotected side or edge ten feet or more above a lower level, the proper course in this instance would have been for the circuit court to have vacated citation 1, item 1, in its entirety. It did not, and it instead affirmed the existence of the violation, mistakenly or otherwise. Morel, Midwest, and East Iowa chose not to appeal the circuit court's decision and, consequently,

they cannot dispute that they exposed East Iowa's employees to a walking/working surface with an unprotected side or edge ten feet or more above a lower level without fall protection.

Likewise, the degree of an employee's exposure to a hazard or violative condition is relevant to the calculation of a penalty for a violation, as noted above. But, because the Appellees never raised penalty calculation as an issue before the Commission, the circuit court, or before this Court, it is similarly irrelevant.

In its own review of this matter, the Commission interpreted KRS 338.991(11) consistently with OSHA's interpretation of 29 U.S.C. § 666(k), holding that, to properly classify this violation as "serious," the Cabinet was required to show 1) that an injury could result from an employee's exposure to the cited condition; and 2) a substantial likelihood that the injury would cause an employee death or serious injury. KRS 338.991(11). The Commission's finding of a violation of 803 KAR 2:417 § 3(1)(b), which the circuit court affirmed, and the Appellees did not appeal, and cannot now contest, required a finding that an employee of the Appellees, not wearing fall protection, was exposed to an unprotected side or edge greater than ten feet in height. No party contests that East Iowa's employees were working from a height of 42 feet, and that the only fall hazard at issue in this matter, listed in citation 1, item 1, was a hazard of falling 42 feet. It is certainly possible to sustain an injury from falling from that height, with a substantial likelihood of serious physical injury, or possibly death.[7] As such, substantial evidence supported that this was a serious violation, and it was

error for the trial court to reverse the Commission on this point.

## 2. DISMISSAL OF CITATION 1, ITEM 2, FOR SERIOUS VIOLATION OF THE METAL DECKING STANDARD, 29 C.F.R. § 1926.754(e)(5)(i).

As noted, Midwest Steel hired East Iowa to install the metal decking on the 42–foot–high flat roof under construction, and East Iowa assigned four employees, including Foreman McAtee, to do this work. Each of the decking sheets had corrugated surfaces, measured thirty feet by thirty-six inches, and weighed approximately 180 pounds. As all of the Appellees were aware, East Iowa's employees followed a method of placing the decking sheets, end to end with some overlap of the sheets and their corrugated surfaces, and then nailing down with a pneumatic nail gun, or "wind tacking," the decking sheets after five to ten decking sheets, or 450– to 900–square feet of decking, had been placed. During this process, workers had access to areas where sheets had been laid, but not wind tacked, and stood on the sheets that had not been wind tacked.

The Appellees describe the overlapped decking sheets as "interlocked" because of the combination of their weight and the shape of the corrugation, which resembled an alternating pattern of upside-down and right-side-up trapezoids going lengthwise along the edges of each sheet. They assert that when the decking sheets are overlapped, the corrugation only allows for approximately one-half inch to an inch and three-quarters of movement, which allows for a row of decking sheets to be further straightened out and adjusted, but prevents decking from sliding unless it is kicked with a substantial amount of force.

---

7. *See also Secretary of Labor v. Whiting–Turner Contracting Co.,* 13 O.S.H.C. 2155, 2157 (1989) ("A fall from even that modest height [of 12 feet] could result in serious injury, especially a fall onto the sort of debris typically found around a construction site.")

The Appellees also claim that this method of installation is common to the metal decking industry and that it is more convenient than wind tacking each sheet as it is laid because it allows employees to make small adjustments to the decking if the panels, when laid, are improperly squared or unevenly installed. East Iowa's part owner, Greg Naso, further testified that

You've got to lay out enough that you can get it positioned, but you don't lay out so much that you've got more out than you can deal with, if—you know, if unforeseen conditions come up with wind or what have you. If the wind's blowing twenty mile[s] an hour when you go to start work, you may be tacking down every sheet as you go or you may just determine that it's too windy whatsoever to work and that's something that's got to be a judgment call by the individual at that particular time.

In a similar vein, Fred Shelton, Midwest's project manager, testified:

By the end of the day we have four to six nails or wales, enough to secure the deck so the wind will not lift the deck off the structure.

The Cabinet did not agree that East Iowa's method of installing the metal decking sheets complied with 29 C.F.R. § 1926.754(e)(5)(i), which provides that "metal decking shall be laid tightly and immediately secured upon placement to prevent accidental movement or displacement." And, in light of the 42–foot height at which the employees were performing this work, the Cabinet cited the Appellees for a serious violation of this standard. Thereafter, the Commission affirmed the citation. After reviewing the pictures of the decking sheets and a diagram of the decking sheets drawn by Naso and entered into evidence, the Commission conceded that the weight and form-fitting overlap of the decking sheets caused the decking

sheets to be "laid tightly," per the regulation. But, after considering the testimony that decking sheets that had been placed, but not wind tacked, could be dislodged by wind, the Commission concluded that the decking sheets did not "interlock" to the point of being secured when placed and, thus, had not been "immediately secured" within the meaning of the standard; rather, the Commission concluded that the only method utilized by East Iowa, sufficient to secure the metal decking against wind, was wind tacking.

On appeal before the circuit court, the Appellees did not contest the "serious" classification of this alleged violation. Instead, they argued that the violation should have been vacated entirely because, as they contended, East Iowa's method of installing the decking sheets complied with the standard, i.e., the decking sheets had been "immediately secured upon placement." As the Appellees put it:

The Commission reasoned that, since an un-tacked sheet could be dislodged by a strong wind, that EID [East Iowa] had not "immediately secured" the decking in conformity with the standard. This is a tortured reading of the standard since the language does not require the decking to be impermeable to all forces of nature.

(Emphasis theirs.)

Continuing this argument, the Appellees faulted the Commission for not offering a more concrete definition of "laid tightly" and "immediately secured." Citing to an OSHA decision, Secretary of Labor v. Northwest Erectors, Inc., 17 O.S.H.C. 1853 (1996), the Appellees contended that "secured," within the meaning of the regulation, meant that "the decking would not jiggle around excessively and would not move or open up enough for someone to fall through." The Appellees pointed to the evidence of record regarding the

weight of the decking sheets and what they again described as their "interlocking nature" to support that they met this standard.

■ The circuit court was persuaded by this argument. We are not. Nor, for that matter, are we persuaded by what appears to be a new argument posited by the Appellees before this Court: the Appellees now also contend that, even if wind conditions were contemplated by the standard, the Cabinet put forth no evidence demonstrating what the wind conditions were like on the date of the citation and that the citation would have been properly vacated on that basis, as well.

■ We preface our discussion of the Appellees' various arguments by agreeing that 29 C.F.R. § 1926.754(e)(5)(i) does not require the decking to be impermeable to all forces of nature. Like OSHA, the purpose and intent of KOSHA is aimed at providing working men and women safe and healthful working conditions, and it was not aimed at making an employer the insurer of, and strictly liable for, the safety of all employees under any circumstances imaginable. It is, however, aimed at requiring an employer to protect employees from foreseeable hazards. To that effect, the drafters of this standard understood that wind is among the many forces that might foreseeably displace metal decking from a roof, and they drafted this standard, in part, to prevent that. The Occupational Safety and Health Administration published the following comment to 29 C.F.R. § 1926.754(e)(5)(i) in the Federal Register:

> There were three comments received in support of the requirement to secure decking immediately after it is laid and aligned. A representative of the Bridge, Structural, Ornamental and Reinforcing Ironworkers commented that bays of unfastened sheets are unnecessary. SDI [The Steel Deck Institute] agreed that all decking, whether single or multi-span, should be fastened immediately after alignment and should not be used as a working platform until properly attached. A witness testified that stepping on, or leaving a deck sheet unsecured should be prohibited because of the following: (1) Decking can separate due to ice, snow, water, oils, or combinations of these that cause side laps to uncouple easily, (2) *loose decking has an aerodynamic effect and in some winds it can fly, resulting in injuries and property damage,* and (3) there are situations where the supports are not level resulting in a sag in the decking that increases the chance that two sheets could unmarry.
>
> OSHA agrees with the requirement that all metal decking must be laid tightly and secured, once it has been aligned and adjusted, to prevent accidental movement or displacement. This may be accomplished by installing final deck attachments or safety deck attachments such as tack welding the panel, or with a mechanical attachment, such as self-drilling screws or pneumatic fasteners.

Safety Standards for Steel Erection, 66 Federal Register 5196, 5221 (Jan. 18, 2001) (internal citations omitted; emphasis added).

■ The standard is intended to prevent wind from displacing metal decking, and the regulation itself does not make the phrase "immediately secured" dependent upon how much or how little wind each day brings. As one court put it, the drafters "could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation." *Cal. Stevedore & Ballast Co. v. OSHRC,* 517 F.2d 986, 988 (9th Cir.1975). Indeed, most OSHA standards, including 29 C.F.R.

§ 1926.754(e)(5)(i), have requirements or prohibitions that, by their own terms, must be observed whenever specified conditions, practices or procedures are encountered. These standards are predicated upon the existence of a hazard whenever their terms are not met.[8] When a standard prescribes specific means of enhancing employee safety, a hazard is presumed to exist if the standard's terms are violated. *See, e.g., Harry C. Crooker & Sons, Inc. v. OSHRC,* 537 F.3d 79, 85 (1st Cir.2008) (regulation prohibiting construction equipment from operating within ten feet of energized power lines "speaks for itself," and Secretary need not prove that violative conditions are actually hazardous); *Secretary of Labor v. C.B. Roofing & Constr., Inc.,* 22 O.S.H.C. 1361, 1367 (2008); *Seedorff Masonry, Inc.,* 21 O.S.H.C. at 1512; *Secretary of Labor v. N. Tex. Contracting, Inc.,* 21 O.S.H.C. 1419, 1423 (2006); *Secretary of Labor v. Sawyer Steel, Inc.,* 21 O.S.H.C. 1196, 1201 (2004) ("Arguing that a hazard does not exist is an impermissible challenge to the wisdom of the standard."); *Secretary of Labor v. Randalls Food & Drugs, Inc.,* 20 O.S.H.C. 1587, 1592 (2003), *petition for review denied* 116 Fed.Appx. 501 (5th Cir. 2004). Thus, to establish a violation of this type of standard, the Cabinet does not have to establish exposure to the ultimate danger presented by a hazard as a separate element independent of the violation. Rather, the Secretary or Cabinet need only prove that an employee was exposed to a condition that does not comply with the standard.[9]

The question becomes, then, whether substantial evidence supports that the Appellees failed to immediately secure the metal decking from being displaced by wind, within the meaning of the regulation. Here, we agree with the Commission. The drafters' comment bolsters the inference that overlapping metal decking does not necessarily equate to securing it, as it states that a variety of conditions and situations, including wind, can lead overlapped metal decking to easily uncouple and unmarry. Furthermore, the testimony in this matter leads to a reasonable inference that the metal decking utilized by the Appellees, which had been overlapped but had not been wind tacked, was not secured from being accidentally moved or displaced by the wind, or, as Midwest's project manager put it, "enough to secure the deck so the wind will not lift the deck off the structure."

Certainly, wind tacking is not the only method for securing metal decking from being displaced by wind. Although the drafters' comment, cited above, provides several examples of how metal decking may be secured, the standard itself simply mandates that the method should protect the metal decking from accidental movement or displacement immediately upon placement.

 Wind tacking was, however, the only method for securing this decking against wind, utilized by East Iowa, which the Commission deemed to satisfy the standard. And, it is evident from the rec-

---

8. By its own terms, 29 C.F.R. § 1926.754(e)(5)(i) is predicated upon the existence of a hazard, *i.e.,* an increased possibility of an accident, if its standard is not met: "accidental movement or displacement" of "metal decking." On page 49 of its own order, the Commission also found that the hazard is implicit in this regulation, and likewise held that the Cabinet was not required to prove that noncompliance created a hazard in order to establish a violation of the standard.

9. *See, e.g., Mayflower Vehicle Sys., Inc.,* 68 Fed.Appx. at 692. (standard requiring stand to be bolted so that only supervisor or safety engineer could move it did not require separate finding of hazard; free movement of stand constituted hazard).

ord that the Commission reviewed both the shape and size of the decking sheets in question when it arrived at that conclusion. We view the Commission as an agency presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and, therefore, must respect. And, to paraphrase *Homestead Nursing Home v. Parker*, 86 S.W.3d 424, 426 (Ky.App.1999), although our review of the Commission's statutory interpretations is less deferential than our review of its factual determinations, nevertheless, the Commission's construction of its statutory mandate, particularly its construction of its own regulations, is entitled to respect and is not to be overturned on appeal unless clearly erroneous. We find the Commission's interpretation consistent with the purposes of KOSHA, and, likewise, find that the circuit court erred in reversing the Commission and vacating this citation.

As an aside, we would also reemphasize, and quote, two points that the Commission addressed in its own order:

> None of the cited companies in the case at bar applied for a variance from the decking standard to protect themselves from the operation of the standard, given their expressed concerns about aligning the sheets before securing them. KRS 338.153(1). Under the statute an employer may apply for an exception to a standard which may be granted if the employer can prove its work practices would result in an environment "as safe and healthful as those which would prevail if he complied with the standard." Although the companies raised the affirmative defense of employee misconduct, they did not raise or argue the affirmative defense of infeasibility which is permitted under our law. See [*Secretary of Labor v.*] *Seibel Modern Manufacturing and Welding Corporation*, CCH [1991]

O.S.H.D. 29,442, pages 39,681–39,684, BNA 15 O.S.H.C. 1218, 1225–1228, a federal review commission decision which upheld the defense and placed the burden of proving it on the employer.

## CONCLUSION

For the forgoing reasons, the December 30, 2009 order of the Franklin Circuit Court is reversed, and the October 7, 2008 order of the Commission is reinstated.

ALL CONCUR.