**BOWLIN GROUP, LLC, Appellant**

v.

**SECRETARY OF LABOR, COMMONWEALTH of Kentucky; and Kentucky Occupational Safety and Health Review Commission, Appellees.**

No. 2013–CA–000432–MR.

Court of Appeals of Kentucky.

July 11, 2014.

Robert A. Dimling, Cincinnati, OH, Griffin Terry Sumner, Kyle D. Johnson, Louisville, KY, for appellant.

David N. Shattuck, Office of General Counsel, Frankfort, KY, for appellee, Secretary of Labor.

Frederick G. Huggins, Frankfort, KY, for appellee, Kentucky Occupational Safety and Health Review Commission.

Before ACREE, Chief Judge; TAYLOR and VANMETER, Judges.

## OPINION

ACREE, Chief Judge:

Bowlin Group, LLC, appeals from the February 7, 2013 Opinion and Order of the Franklin Circuit Court which affirmed the Decision and Order of the Kentucky Occupational Safety and Health Review Commission which upheld the Secretary of Labor's citation of Bowlin for a safety violation. We affirm.

### I. Facts and Procedure

The safety violation came to the attention of the Secretary as a result of an accident and injury suffered by a Bowlin employee on April 12, 2009. Bowlin, which constructs and repairs transmission and distribution lines for power companies,[1] had employed a crew of workers to reconductor[2] distribution lines along Kentucky Highway 79 in Meade County, Kentucky.

---

1. Bowlin actually undertakes this work through one of its subsidiaries, Bowlin Energy, LLC.

2. Reconductoring is the replacement of old copper wire with new aluminum wire.

This reconductoring process required Bowlin workers to string new lines alongside the existing energized lines to avoid a power disruption. The new line was connected to a "tensioner," a machine incorporating a winch to keep a line taut. At some point the new line became energized, though this fact was unknown to any of the workers. Consequently, electricity was flowing from the energized lines through the new lines to the tensioner mounted on a Bowlin truck.

The risk of a new line becoming electrified under such circumstances is anticipated by regulations designed to protect the safety of workers. We will address the specific regulation in greater detail later. However, it is sufficient to say generally, as a matter of elementary physics, that injury from contact with electricity can be avoided in three ways: (1) isolating oneself from it (*i.e.,* staying away from the source of electricity), (2) insulating oneself from it (*i.e.,* handling a source of electricity with a protective insulating barrier between the source and the human), or (3) by "grounding" the electricity (*i.e.,* diverting the electrical current to the earth by means of a wire or other conductor). None of these means of avoiding human contact with electricity was employed in this case.

While stringing one of the new lines, Bowlin foreman Ronald Douglas observed that the new line had fallen slack. Douglas shouted for a crew member to increase the line's tension. To do this, an employee had to turn the winch on the tensioner mounted in the truck. Bowlin employee Patrick Haste responded. The truck had not been grounded; that is to say, there was no conductor to divert any leaking current, or fault current, from the truck to the earth. Additionally, Haste was not wearing any insulating personal protective

equipment (PPE) that would have maintained a barrier between the electric current and his skin. When Haste touched the tensioner, then carrying the current from the line, he suffered severe electrical burns. Haste's hip was badly burned, his foot injured, and his right arm was injured so severely that it required amputation.

Bowlin notified the Kentucky Occupational Safety and Health Administration of the accident. Andrew Rapp, a compliance officer, conducted an investigation, after which the Secretary of Labor issued Bowlin one citation for a serious violation.[3]

Bowlin challenged the citation. A hearing officer conducted an evidentiary hearing, after which she concluded the citation had been properly issued, and rejected Bowlin's employee-misconduct defense. The hearing officer recommended that the citation be upheld. Bowlin requested review by the Commission. In its Decision and Order entered on March 6, 2012, the Commission upheld the citation. Bowlin appealed to the Franklin Circuit Court which affirmed the citation. This appeal followed. Additional facts will be discussed as they become relevant to our review.

## II. *Standard of Review*

A court of review may only overturn an agency's decision "if the agency acted arbitrarily or outside the scope of its authority, if the agency applied an incorrect rule of law, or if the decision itself is not supported by substantial evidence on the record." *Dep't of Labor v. Morel Const. Co., Inc.,* 359 S.W.3d 438, 442 (Ky.App.2011). Our function here "is one of review, not of reinterpretation." *Id.*

We review questions of fact to determine "whether the agency's decision was

---

**3.** A serious violation is one from which "there is a substantial probability that death or seri-

ous physical harm could result[.]" Kentucky Revised Statute (KRS) 338.991(11).

supported by substantial evidence or whether the decision was arbitrary or unreasonable." *Id.* (citation omitted). Kentucky continues to adhere to the longstanding definition of substantial evidence "as that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." *Bowling v. Natural Res. & Envtl. Prot. Cabinet,* 891 S.W.2d 406, 409 (Ky.App.1994) (citation omitted).

In contrast, we review questions of law *de novo,* affording the agency's interpretation no deference. *Morel Const. Co.,* 359 S.W.3d at 442.

■ Before proceeding further, we pause to observe that the Kentucky Occupational Safety and Health Act (KOSHA) is patterned after its federal counterpart; for that reason, "KOSHA should be interpreted consistently with federal law." *David Gaines Roofing, LLC v. Kentucky Occupational Safety & Health Review Comm'n,* 344 S.W.3d 145, 148 (Ky.App. 2011).

### III. *Analysis*

Before this Court, Bowlin claims three errors. First, Bowlin claims the circuit court erred when it refused to vacate the Commission's decision notwithstanding what Bowlin believes to be the Commission's improper interpretation of the cited standard. Second, Bowlin claims error in the circuit court's finding that substantial evidence supports the Commission's finding that Bowlin violated the cited standard. Finally, Bowlin claims the circuit court erred by rejecting its employee-misconduct affirmative defense.

4. Code of Federal Regulations.

5. The standard articulated in 29 C.F.R. § 1926.955(c)(3) is applicable to employers in

### A. *Preference for Grounding*

Bowlin first argues that the Commission improperly interpreted the cited standard, 29 C.F.R.[4] § 1926.955(c)(3), as indicating a preference for grounding.[5] Bowlin contends the Commission's decision must be vacated in light of this erroneous interpretation. We are not persuaded.

The Secretary of Labor cited Bowlin for failing to comply with 29 C.F.R. § 1926.955(c)(3). That regulation requires employers:

> Where there is a possibility of the conductor [in this case, the new line] accidentally contacting an energized circuit or receiving a dangerous induced voltage buildup, to further protect the employee from the hazards of the conductor, the conductor being installed or removed shall be grounded or provisions made to insulate or isolate the employee.

*Id.* In its decision, the Commission interpreted 29 C.F.R. § 1926.955(c)(3) to include a preference for grounding over insulating or isolating. According to the Commission:

> "Or provisions made" separates grounding from insulating or isolating, placing emphasis on the former; the regulation says "shall be grounded" but shall be isolate or shall be insulate is not even grammatically correct. In other words, the standard can be read to say "the conductor shall be grounded or *other* provisions made ..." The word other is implied or understood. But even though the standard has a preference for grounding, [an employer] may still elect to insulate or isolate instead.

(Commission's Decision on Review at 24).

■ Bowlin contends the Commission's interpretation of 29 C.F.R.

Kentucky through KRS 338.061 and 803 Kentucky Administrative Regulations 2:421.

§ 1926.955(c)(3) contradicts the regulation's plain language, which permits an employer to ground the conductor *or* insulate its employees *or* isolate its employees. Bowlin asserts the use of the word "or" reflects a choice of equally acceptable alternatives; there is nothing in the regulation, Bowlin argues, that suggests one method is preferred over another. Continuing this argument, Bowlin claims reversal is required because the Commission's erroneous interpretation permeated its decision.

29 C.F.R. § 1926.955(c)(3) is presented in the disjunctive. Employing the disjunctive, the regulation identifies three alternative compliance methods: grounding, insulating, or isolating. *See Board of Nat'l Missions of Presbyterian Church in U.S. of America v. Harrel's Tr.*, 286 S.W.2d 905, 907 (Ky.1956) ("In common and natural usage the word 'or' is disjunctive and expresses an alternative as between either of two or more separate subjects or conditions and implies an election or choice as between them."). Accordingly, we agree with Bowlin that the regulation does not indicate a preference for grounding.

We reject, however, Bowlin's claim that reversal is mandated because the "Commission's legal error permeated its Decision." (Appellant's Brief at 8). Bowlin maintains that permeation is self-evident because "throughout the entirety of its Decision, [the Commission] referenced Bowlin's purported 'failure' to ground the tensioner truck." (Appellant's Brief at 9). Consideration of the interplay among the three options under the regulation illuminates a significance with regard to the

grounding option that, understandably, gives an appearance that it is preferred.

The option of isolation was inherently impossible given that someone had to actually operate the tensioner. In accordance with its method of operation, Bowlin consciously determined that the truck in which the tensioner was mounted not be grounded. This eliminated the last "option" available so that the sole remaining way to comply with the regulation was insulation; insulating its workers, *i.e.*, requiring that they wear gloves and sleeves, effectively became mandatory if employees were to be safe from electrocution and lesser degrees of electric shock. It is not surprising to this Court that the Commission referenced Bowlin's failure to ground the tensioner truck throughout its order—that failure made insulation all the more necessary.[6]

We agree with the circuit court's resolution of this issue and adopt its analysis as our own. The circuit court said:

The Commission in their Final Order did discuss whether the regulatory language established some preference for grounding over insulating or isolating employees, but any such distinction is irrelevant. The Commission stated, "while the standard does prefer grounding to prevent accidental electrical injury, the standard still gives the employer the option of insulating or isolating its employees." (A.R., Pleading 26, p. 27). Thus, regardless of what the statute prefers, the Commission recognized that so long as the employer either grounds the equipment, insulates employees, or

---

**6.** It seems there are practical advantages to grounding as opposed to insulation. This is apparent from the fact that grounding can be accomplished by a single worker for the benefit of all workers, while insulation requires every individual worker to don, for his own protection alone, rubber gloves and sleeves described in the record as "hot" and "clumsy." (Transcript of Hearing at 269, lines 11–14). Whether that distinction is indicative of another kind of preference, however, is irrelevant given the circuit court's conclusion that the Commission did not fail ultimately to treat each option as equally acceptable.

isolates its employees, the regulation is satisfied.

(R. at 100). We find no error warranting reversal here.

### B. Violation of 29 C.F.R. § 1926.955(c)(3)

■ Bowlin next contends that the Commission erred when it concluded that Bowlin had violated the cited standard, 29 C.F.R. § 1926.955(c)(3).

To establish a safety violation, the labor cabinet must prove by a preponderance of the evidence (1) the applicability of the standard, (2) the employer's noncompliance with the terms of the standard, (3) employee access to the violative condition, and (4) the employer's actual or constructive knowledge of the violation. *David Gaines Roofing*, 344 S.W.3d at 148 (citation omitted). In this case, Bowlin challenges the sufficiency of the evidence as to the second and fourth elements.[7]

#### (i). Non compliance with Terms of the Standard

■ Given the facts of this case, the focus, necessarily, is on Bowlin's policy, if any, to ground or insulate.

Blevins Bowlin testified that each employee is issued a pair of rubber gloves and sleeves (also known as PPE) upon hire. On August 10, 2009—two days before Haste's accident—Bowlin conducted a ten-hour OSHA safety training course taught by consultant Michael Gibson. During the training, Gibson reminded crew members that "the first line of defense is personal protective equipment." Donald Mulliken, Bowlin's Safety Director, reminded crew members that they could be disciplined for failing to wear PPE. At the conclusion of the training session, Mulliken

provided each crew member, including Haste, with new insulated rubber gloves and sleeves.

At the beginning of the work day on August 12, 2009, crew members were again advised to be mindful of safety issues during the customary prework tailgate meeting. Foreman Douglas instructed all the crew members to wear gloves and sleeves.

The Commission found that, despite having extensive and commendable safety and training policies, Bowlin did not have a well-established internal policy for grounding tensioner trucks, and did not have a specific policy requiring employees to wear PPE when approaching a tensioner truck. With respect to grounding the tensioner truck, there is ample evidence in the record to support the Commission's finding that, on the day of the accident, the tensioner truck was not grounded. Compliance Officer Rapp testified that his investigation revealed there was no grounding system on the tensioner truck. Employees interviewed by Rapp stated they had no experience grounding the truck and that it was not standard practice to do so. Foreman Douglas reported to Officer Rapp that he was unaware of ever grounding the tensioner truck. Haste testified the tensioner truck never had a ground on it, and there was no discussion on the day of the accident regarding the need to ground that truck. Furthermore, Mulliken admitted he did not even know Bowlin owned the truck in which the tensioner was mounted.

Our inquiry, however, is not at an end. Despite the ungrounded tensioner truck, if Bowlin had made provisions to insulate its

---

7. Bowlin also contends the Commission committed a legal error when it applied its misinterpretation of the standard as indicating a preference for grounding. Having previously resolved this issue, it warrants no further discussion.

employees, the requirements of the cited standard would have been met.

The Commission found there was no work rule requiring employees to wear PPE while working on the ground or while working near the tensioner. The evidence concerning Bowlin's PPE policy was certainly conflicting. Safety Director Mulliken, Consultant Gibson, and employee Jerry Condor all testified that employees were told generally during the ten-hour OSHA training on August 10, 2009, that PPE, including gloves and sleeves, was to be worn. Likewise, Condor confirmed that Foreman Douglas instructed the crew members generally during the tailgate meeting to wear their PPE. It is quite clear that Bowlin's policy was for employees to wear PPE while working near lines known to be energized. There is no dispute that, on the day of the accident, crew members, including Haste, were wearing their PPE while working off the ground with lines known to be electrified—that is, while working with the lines they were replacing. The question, however, is whether Bowlin's policy extended to employees working on the ground, around lines that could be, but were not known to be, electrified, including while operating or handling the tensioner.

Our review of the record reveals the only direct evidence employees were told to insulate with gloves and sleeves while handling the tensioner was the testimony of Foreman Douglas. He testified that employees were instructed during the OSHA training to use gloves and sleeves both on the ground and when handling the tensioner. However, this contradicts the statement he gave Officer Rapp during his

investigation. According to Rapp, Douglas said he was unaware of any policy for wearing PPE when approaching the tensioner truck.

Haste contradicted Foreman Douglas. Haste testified that, while Bowlin certainly had a "cradle to cradle" policy[8] for wearing rubber gloves while working off the ground, there was no such policy for ground work. Haste said, in his experience, crew members did not wear PPE, including rubber gloves, when operating the tensioner.

Bowlin employee Condor explained that crew members would wear gloves "most of the time" when working around the tensioner truck. Condor also said the gloves were hot and clumsy and he did not wear them if he did not have to while working on the ground.

The Commission was also influenced in its decision by testimony that, after the accident, Bowlin disciplined Foreman Douglas, Condor, and others for failing to ground the tensioner truck, not for failing to wear insulating gloves and sleeves. In the Commission's view, this indicated that Bowlin did not have a policy requiring employees to wear PPE while working on the ground and/or near the tensioner.

 Bowlin claims the Commission improperly relied upon Haste's testimony, and urges this Court to remedy the alleged error. The Commission took care to explain why it found some of Bowlin's witnesses unconvincing and less than credible and, instead, chose to rely, in part, upon Haste's testimony. "The [Commission] is the ultimate decision-maker in occupation-

8. The cradle to which reference is made here is the housing attached to a truck upon which rests the truck's extendable mechanical arm which holds a "bucket" from which a lineman can work while the arm is extended and elevated. The "cradle to cradle" policy re-

quires the worker to wear the gloves and sleeves from the time he climbs into the bucket while in its cradle, through the period of time the arm is elevated and extended, until the bucket is returned to its cradle on the truck.

al safety and health cases[.]" *Sec'y, Labor Cabinet v. Boston Gear, Inc., a Div. of IMO Industries, Inc.*, 25 S.W.3d 130, 133 (Ky.2000). Likewise, it certainly bears repeating that "if there is substantial evidence in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record." *Id.* at 134 (citation omitted); *David Gaines Roofing*, 344 S.W.3d at 147. In sum, we find sufficient evidence in the record supporting the Commission's finding that Bowlin did not have a specific work policy requiring employees to wear PPE while working on the ground.

### (ii). Knowledge

■■■■■ As noted, a citation may only be issued if the employer has actual or constructive knowledge of the violation. The Secretary of Labor "can satisfy this burden by establishing that the employer either knew, or, with the exercise of reasonable diligence, could have known of the presence of the violative condition." *Sec'y of Labor v. Pride Oil Well Service*, 15 OSCH (BNA) 1809, 1992 WL 215112, at *6 (1992).

> An employer has constructive knowledge of a violation if the employer fails to use reasonable diligence to discern the presence of the violative condition. Factors relevant in the reasonable diligence inquiry include the duty to inspect the work area and anticipate hazards, the duty to adequately supervise employees, and the duty to implement a proper training program and work rules.

*David Gaines Roofing*, 344 S.W.3d at 148 (quoting *N & N Contractors, Inc. v. Occupational Safety & Health Review Comm'n*, 255 F.3d 122, 127 (4th Cir.2001)). Furthermore, the actual or constructive knowledge of the employer's supervisor or foreman may be imputed to the employer. *New York State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 105 (2d Cir.1996);

*Kokosing Const. Co. v. Occupational Safety & Hazard Review Comm'n*, 232 Fed. Appx. 510, 512 (6th Cir.2007).

In this case, Mulliken testified that it was the foreman's responsibility to enforce Bowlin's safety rules. With respect to the options outlined in 29 C.F.R. § 1926.955(c)(3), Mulliken stated that the foreman makes the decision to insulate, isolate, or ground, and communicates that decision to the crew members.

Foreman Douglas admitted the tensioner truck was not grounded on the day of the accident. His knowledge is imputed to Bowlin. Accordingly, the battleground for this dispute is whether Bowlin had actual or constructive knowledge that Haste was not insulated when he approached the tensioner.

The Commission found "Bowlin had constructive knowledge of the violation because Foreman Douglas failed to anticipate hazards to which his employees may be exposed and take measures to prevent the occurrence of violations." Bowlin argues Foreman Douglas could not possibly have constructive knowledge of Haste's failure to wear PPE because Foreman Douglas was unable to see Haste at the time Haste approached the tensioner truck.

Officer Rapp testified that Foreman Douglas was close—at least within yelling distance—of the tensioner truck when he issued the order for more tension. Foreman Douglas explained he was standing on the running board of his pickup truck when he noticed slack in the line; he was twenty to twenty-five feet from the tensioner truck. He could not see who responded to his verbal request to add tension, but anticipated that the employee would use PPE before approaching the tensioner truck. Foreman Douglas also related that he had observed Haste wearing PPE earlier that day.

Foreman Douglas was certainly aware that the tensioner truck was neither grounded nor isolated. It was therefore especially incumbent upon Foreman Douglas to ensure that crew members were insulated before contacting the tensioner. The record indicates crew members would often remove their PPE while on the ground, particularly when they were not actively engaged in work activities.[9] Foreman Douglas did not direct his verbal request to any particular employee. It was certainly possible for any one of the numerous crew members milling around the work site to respond, including Haste. Furthermore, Bowlin characterizes Haste as an "inexperienced tensioner operator." Given these circumstances, reasonable diligence would call for the foreman's anticipation or cautious supposition of the hazard that could befall a member of his crew, particularly one lacking tensioner-specific experience, approaching the tensioner without PPE. The evidence supports the Commission's finding that Foreman Douglas was in the vicinity of the accident and capable, with the exercise of reasonable diligence, of observing, and even correcting, Haste's actions.

A mere glance at Haste would have been all the foreman needed to alert him to the fact Haste had removed his sleeves and gloves upon descent, and then approached the tensioner truck without them. *See New York State Elec.*, 88 F.3d at 110 ("The testimony indicated that [supervisor and injured employee] were working at the same intersection on the same gas-line project. Although [the supervisor] says he did not actually notice that [the employee]

was not wearing the appropriate safety gear, the record strongly suggests that if he had looked at [the employee] he could have known."). In other words, the violation was in plain view. *R.P. Carbone Const. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 819 (6th Cir.1998). Certainly a foreman can be expected to carefully and visually monitor his supervisees while in the vicinity of an employee engaging in potentially hazardous activity.

We need not ignore the evidence Bowlin presented to conclude, and we do conclude, that the Commission's finding that Bowlin had constructive knowledge of Haste's failure to don rubber gloves and sleeves before handling the tensioner was reasonable and supported by the remaining substantial evidence.[10] We affirm the Commission's finding.

## C. Employee–Misconduct Defense

■■■ Finally, Bowlin argues the Commission improperly rejected its employee-misconduct defense. Again, we are not persuaded.

■■■ "To establish employee misconduct as an affirmative defense, an employer must carry its burden of showing that due to the existence of a thorough and adequate safety program that is communicated and enforced as written, the conduct of its employee(s) in violating that policy was idiosyncratic and unforeseeable." *CMC Elec., Inc. v. Occupational Safety & Health Admin.*, 221 F.3d 861, 866 (6th Cir.2000). The defense consists of the following elements:

9. Notably, Haste testified he wore his PPE while working in the air, but took it off when he descended. Likewise, Condor testified he was not wearing his PPE when Foreman Douglas requested more tension because there was no need to; "nobody was doing anything."

10. Because we are affirming on the basis of constructive knowledge, we need not address whether the Commission's finding of actual knowledge was supported by substantial evidence.

the employer must show that (1) it had established work rules designed to prevent the violation, (2) it had adequately communicated the rules to its employees, (3) it had taken steps to discover violations, and (4) it had effectively enforced the rules when violations were detected.

*Mayflower Vehicle Sys., Inc. v. Chao*, 68 Fed.Appx. 688, 690 (6th Cir.2003) (citation omitted); *Dep't of Labor v. Am. Roofing & Metal Co.*, 2011 WL 4407520, *5 (Ky.App. 2011)(2010–CA–000085–MR and 2010–CA–001037–MR.) [11]

Bowlin argues that Haste's violation of known safety rules was the product of unforeseeable employee misconduct. The Commission rejected this defense, concluding that Bowlin had failed to meet its burden of proof with respect to the first and third elements. As previously discussed, the Commission was convinced that Bowlin did not have an established work rule requiring employees to wear PPE while working on the ground and before handling the tensioner. Having previously discussed the issue, we need not recount here the evidence in support of the Commission's decision.

The Commission also found Bowlin failed to establish that it had taken adequate steps to discover safety violations. The Commission was not persuaded that Mulliken's occasional on-site visits amounted to an adequate system of discovering employee noncompliance. These visits were often announced to the employees in advance because Mulliken had to contact the foreman ahead of time to locate the crew's whereabouts. Furthermore, the Commission was not persuaded that Foreman Douglas, the employee tasked with primary responsibility for day-to-day en-

forcement of the safety rules, had adequately engaged in detection of the safety violations on the day of Haste's accident.

"Where the fact-finder's decision is to deny relief to the party with the burden of proof or persuasion, the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it." *McManus v. Kentucky Ret. Sys.*, 124 S.W.3d 454, 458 (Ky.App.2003). Bowlin has not identified evidence so overwhelming that it compels reversal of the Commission's decision.

### Conclusion

The Franklin Circuit Court's February 7, 2013 Opinion and Order is affirmed.

ALL CONCUR.

---

11. We have cited this unpublished opinion in accordance with Kentucky Rules of Civil Procedure 76.28(4).